# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

Erin Lea Tusar,

                        Plaintiff,

        v.

Nancy A. Berryhill, Acting
Commissioner of Social
Security Administration,

                        Defendant.

No. 18-cv-00958

(Judge Mannion)

---

## MEMORANDUM

### I.    Procedural Background.

We consider here the appeal of Plaintiff Erin Lea Tusar from an adverse decision by the Social Security Administration ("SSA" or "Agency") on her application for disability insurance benefits. Plaintiff's claim was initially denied at the administrative level on June 12, 2014. Plaintiff then requested a hearing before an administrative law judge ("ALJ"). She received her hearing on May 26, 2016. By Notice of Decision dated July 21, 2016, ALJ Karen R. Jackson denied Plaintiff's claim. Plaintiff requested review by the Appeals Council which, by written decision dated March 12, 2018, denied her request for review. The Appeals Council's decision

constitutes a "final decision" by the Agency which confers jurisdiction on this Court pursuant to 42 U.S.C. 405(g).

## II. Testimony before the ALJ.

### a. Plaintiff's Testimony.

Plaintiff testified at the hearing as did Cory Tusar, her husband, and Betty Hale, a vocational expert ("VE"). All witnesses were physically present in Altoona, Pennsylvania. Also present there was James Johnson, Plaintiff's attorney. The ALJ presided over the hearing by video conference from Louisville, Kentucky.

Plaintiff testified that she resides in Pleasant Gap, Pennsylvania and that she was thirty-nine years of age on the date of the hearing. She stated that she stands five feet three inches tall and weighs two hundred forty pounds. She also stated that her weight fluctuates up and down. She is a married woman. She and her husband have four daughters aged seventeen, fifteen, and twin girls five years of age. They live in a home. At the time of the hearing she had recently regained her driver's license. It had been suspended due to her symptoms at some point. She has an associate's degree and is qualified as a physical therapy assistant. (R. 36-37).

Plaintiff stated that she had not worked since November 20, 2012, her alleged onset of disability date. Previously she had worked for HealthSouth Corporation as a physical therapy assistant. She performed duties such as patient transfers, gait training, managing exercise programs, massage, whirlpool training, ultrasounds, TENS unit therapy, and traction. She mainly worked with elderly patients but occasionally worked with athletes from Penn State University. (R. 37-38). She actually stopped working for a time in 2010 just before her twin daughters were born. She was notified at that time that the twins would be special needs children and that their immediate health issues would require her constant attention for the first months of their lives. She testified further that she did not get back to work "right away" because of the medical needs of her twins. The twins suffer from Turner Syndrome which is characterized by small stature, skin issues, and organ development complications of the heart and kidneys. At some point after the birth of the twins, Plaintiff returned to work. In the fall of 2012 she began having panic attacks and could not bring herself to leave the twins. She was diagnosed with a thyroid problem about the same time. In rambling testimony she described suffering alternately from chills and a feeling that she was burning with fever. She also discussed diabetic symptoms, seizures, migraines, vertigo, and shaking and numbness in her

hands. She spent ten days at the Mayo Clinic for a study where she was video monitored constantly for nine days. The physicians at the Mayo Clinic ruled out epilepsy and reportedly determined that Plaintiff was experiencing a heart condition called POTS that is characterized by an accelerated heart rate. Plaintiff stated that she is constantly fatigued because the heart symptoms impair her sleep. To combat this condition she must drink large quantities of water, consume foods high in salt content, and supplement her diet with additional salt tablets. (R. 38-46).

Plaintiff also stated that she is depressed and takes Prozac to alleviate this problem. She intends to start seeing a therapist but has been delaying because "all her life is crazy for lack of a better way to put that." She also takes potassium chloride or sodium chloride, she is unsure which, for adrenal insufficiency. She testified that despite taking the various medications she identified her situation has been getting worse. She must change position frequently to prevent her blood from pooling in her legs. When she awakens in the morning she must get out of bed slowly and do "ankle pumps" and "butt squeezes" or she will be so unsteady on her feet that she might pass out. Getting up quickly or changing position quickly can also cause her to pass out. Stairs present a problem because of shortness

of breath. Extremely hot weather also exacerbates her tendency to pass out. (R. 46-49).

Plaintiff testified that an average day for her starts at about 7:00 am. She then wakes the girls and gets them dressed. She must do this while sitting on the floor to avoid any bending. She then does their hair and sees them off from the top of the stairs while her husband walks them to the bus. She next makes their beds. Afterwards she finds it necessary to lay on the floor with her feet elevated for about ten minutes. Then she makes her bed and that of her other daughter and reclines with feet elevated once again. She next goes to the kitchen, takes the dishes out of the dishwasher, and puts them away. She then proceeds to straighten things in the bathroom. After completing these tasks she is very tired and must nap for about two hours. Upon awakening she gets dressed and, weather permitting, meets the twins and sits outside with them watching them as they play. She must pay particularly close attention to one of the girls who has been diagnosed with ADHD. In the evening she will watch television with her older girls to show them some attention and talk to them a bit. Afterward she retires for the night. (R. 49-53).

Plaintiff likes to read but is usually so tired at the end of the day that she does not read much. Her older girls are cheerleaders and they attend

high school football games. If the twins start to lose focus or if the weather is too cold they leave these games at halftime. She worries about passing out in public because it could cause her to lose her driver's license again. (R. 53-54). On questioning by her attorney, Plaintiff indicated that her symptoms were first confined to anxiety, then migraines began, and then her problem with loss of consciousness appeared. The condition that causes her to lose consciousness is called POTS, an acronym for postural orthostatic tachycardia syndrome. Plaintiff stated that symptoms of POTS affected her from childhood including sudden hot flashes accompanied by blurred vision and impaired hearing. In her twenties muscular and joint pain began along with excessive fatigue. She stated that she had complained of these symptoms for years but only recently had her doctors "started to piece it together". She stated that if she stands for ten minutes or more blood begins pooling in her lower legs causing swelling and discoloration. She identified a photo taken in the summer of 2015 to corroborate these symptoms. The pooling of blood in her legs produces a shortage of blood in her brain which can cause her to blackout. When this pooling occurs she must lie down and elevate her legs. (R. 54-57).

In terms of the timing of the onset of her conditions, her anxiety started in 2012 while her migraines and POTS emerged in 2013. She was

tested for epilepsy in 2013 at Geisinger Hospital after she had begun passing out in March of that year. (R. 58-59).

  **b. Testimony of Cory Tusar.**

Cory Tusar, Plaintiff's husband, testified that they were married about ten years on the date of the hearing. He stated that he works from home because, given his wife's medical conditions, they are uncomfortable leaving her alone with the children. He is particularly worried about her spells of unconsciousness. (R. 61-62).

Mr. Tusar stated further that his wife's anxiety had manifested prior to September of 2014. Her depression, light headedness, circulatory issues, and leg pain had also manifested before September of 2014. The first time he remembered her passing out was in March of 2013. Since then he stated that it has "gone downhill". He recalled that she had spent more than one week at Geisinger Hospital in the summer of 2013 while being evaluated for epilepsy. He recalled also that his wife went to the Mayo Clinic in the summer of 2014 for an evaluation. He did not accompany her because someone had to remain with their children. A family friend accompanied her to Minnesota and drove her to and from the airport. He testified further that his wife's speech often becomes slurred before she loses consciousness. He compared her demeanor at these times to a

boxer who is out on his feet. He related that she sometimes seems to be in a fog in terms of her focus and concentration. She will be able to hold a clear and coherent conversation but will then suddenly lapse and her speech will become unclear. (R. 63-65).

    **c. Testimony of Betty Hale.**

Betty Hale, a VE, also testified without objection from Plaintiff's counsel. She stated that her testimony would be consistent with the Dictionary of Occupational Titles unless she noted otherwise. The ALJ asked whether a hypothetical person of the same age as the Plaintiff with her educational level and work experience who: could lift twenty pounds occasionally and ten pounds frequently; could stand or walk two hours in an eight hour workday; could sit about six hours in an eight hour workday; experiences rapid changes in posture; could occasionally climb ramps and stairs; could never climb on ropes and ladders; and who needed to avoid even moderate exposure to temperature extremes could perform Plaintiff's past relevant work. The VE stated that the hypothetical person could not do so. The ALJ then asked whether other jobs existed in the national economy that the hypothetical person could perform. The VE stated that bench assembly positions and inspector type positions would be within the capacities of the hypothetical person. (R. 67-68).

The ALJ then adjusted the hypothetical question to add additional limitations in terms of being limited to simple routine tasks and only occasional interactions with the general public. The VE stated that even with the inclusion of these additional limitations, the hypothetical person would be able to perform the jobs previously identified. However, when the ALJ added still more limitations in terms of needing additional breaks to lie down and elevate the feet and being off task for more that twenty percent of an eight hour workday, the VE stated that the addition of these limitations would render the hypothetical person unemployable. (R. 69-70).

### III.    Relevant Medical Evidence.

### a.    Mt. Nittany Medical Center.

The record discloses that Plaintiff treated with three physicians at Mt. Nittany Medical Center from February of 2012 through at least the end of 2015. During this time, Dr. Paul R. Damske, a family practitioner, was Plaintiff's primary care physician. In the approximately three years for which we have records, Dr. Damske saw Plaintiff on approximately twenty occasions. Dr. Damske's first session with Plaintiff on February 3, 2012 resulted in diagnoses of palpitations, polyarthritis, and morbid obesity. These diagnoses remained for the duration of their doctor/patient

relationship. On November 9, 2012, Dr. Damske made additional

diagnoses of fibromyalgia, anxiety, and insomnia. Plaintiff was seen for an

"acute visit" on February 27, 2013 at which time she complained of

dizziness, blurred vision, and profuse sweating. On March 6, 2013, Plaintiff

again saw Dr. Damske and reported on that date that she had passed out

twice in the preceding week. Dr. Damske then referred Plaintiff to his

colleague, Rick Pasquariello, a board certified internist.

Dr. Pasquariello immediately recommended testing to determine the

cause of Plaintiff's emerging syncopal episodes (fainting). Dr.

Pasquariello's first suspicions were complicated migraines or a vasovagal

event. [1] Dr. Pasquariello brought in his colleague, Dr. Brian A. Hyman, a

board certified neurologist, for an additional consult. On March 19, 2013,

Dr. Hyman assessed "migraines without aura and syncope of indeterminate

origin." In numerous visits between March and May of 2013, Dr.

Pasquariello noted migraine headaches, palpitations, tremors, and further

syncopal episodes. On April 11, 2013, Plaintiff told Dr. Pasquariello that at

times she feels drunk, stumbles about, and has slurred speech.

---

[1] Vasovagal syncope occurs when you faint because your body over reacts to certain triggers, such as the sight of blood or extreme emotional distress. The vasovagal trigger causes a sudden drop in blood pressure that leads to loss of consciousness. www.mayoclinic.org.

On April 15, 2013, Dr. Hyman reported that a brain MRI and an EEG that Plaintiff had undergone at Geisinger Hospital came back as normal. However, Plaintiff's syncopal episodes continued and, on April 23, 2013, Dr. Pasquariello recorded that Plaintiff's most recent fainting spell also featured urinary incontinence. On May 5, 2013 Dr. Hyman saw Plaintiff and referred her to Geisinger Medical Center for epileptic testing. When the result of this testing did not produce a clear diagnosis of epilepsy, Dr. Damske referred Plaintiff to the Mayo Clinic in hopes of determining the cause of her syncopal episodes.

On November 19, 2015, Dr. Damske authored a letter indicating that Plaintiff's medical problems include "syncope, extreme fatigue, weakness, visual disturbance, sleep disorders, decreased concentration, depression, and anxiety." Dr. Damske stated further that her "primary diagnosis of disability is postural orthostatic tachycardia syndrome (POTS)." He related all her physical symptoms to POTS as established by "the objective signs and symptoms of her disease criteria." Dr. Damske noted that Plaintiff's symptoms were severe and precluded her from engaging in competitive employment. Dr. Damske concluded that Plaintiff's symptoms had been present for the preceding twelve months and would continue to be disabling for at least an additional twelve months going forward. (R. at 781).

### b.  The Mayo Clinic.

Plaintiff was evaluated by several physicians at the Mayo Clinic from July 29, 2014 to August 7, 2014. The final diagnoses made by the team of physicians at the Mayo Clinic were: syncope, disorder of reduced orthostatic tolerance, anxiety, and major depressive disorder (recurrent and severe without psychotic features). Dr. Paola Sandroni, a neurologist and Dr. Jung In Lee, a psychiatrist, both had multiple encounters with the Plaintiff and collaborated to reach these diagnoses. Dr. Sandroni ordered autonomic testing including a tilt table test to monitor Plaintiff's blood pressure in relation to her heart rate and changes in posture and position. The autonomic screen revealed excessive tachycardia on tilt and a "little bit of blood pressure instability". [2] Dr. Sandroni opined that Plaintiff's syncopal episodes were caused by a combination of tachycardia and blood pressure instability. She stated further that Plaintiff's anxiety could be exacerbating her blood pressure instability. The combination of these factors informed the diagnosis of reduced orthostatic tolerance (POTS).

---

[2] Tachycardia is a heart rhythm disorder in which the heart beats faster than normal while at rest. If left untreated, tachycardia can disrupt normal heart function and produce symptoms such as palpitations, light headiness, and fainting. www.mayoclinic.org.

Dr. Lee's sessions with Plaintiff informed his diagnoses of severe anxiety and severe depression. He recommended that Plaintiff follow with her local psychiatrist for individual psychotherapy and psychotropic medication management. He added clonazepam, a medication to treat seizures and panic attacks, to the already extensive list of medications that had been prescribed by her Pennsylvania providers. Dr. Lee also discontinued Plaintiff from Xanax and changed the dosage of Effexor and Venlafaxine, both anti-depressants. Neither Dr. Lee nor Dr. Sandroni executed a functional capacities examination with respect to Plaintiff.

## IV.    The ALJ Decision.

The ALJ's Notice of Decision dated July 21, 2016 (R. at 12-30) denied benefits to Plaintiff. The ALJ's salient findings of fact and conclusions of law were:

3.  Through the date last insured, the claimant had the following severe impairments: pre-syncope, syncope, POTS disorder or reduced orthostatic tolerance, obesity, major depressive disorder, dysthymia and generalized anxiety disorder.

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the

claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b). The claimant could lift and carry twenty pounds occasionally and ten pounds frequently. She could stand and walk two hours in an eight hour workday and sit six hours in an eight hour workday. There is no requirement for frequent changes in posture from sitting to standing. She is limited to occasionally climbing ramps or stairs and she can never climb ladders, ropes or scaffolds. She is limited to occasionally balancing, occasionally stooping, never kneeling, occasionally crouching and never crawling. She must avoid even moderate exposure to heat, temperature extremes and all exposure to hazards such as unprotected heights or dangerous machinery. She is limited to simple routine work tasks. She can maintain attention and concentration for two hour segments during an eight hour work day. She is able to adapt to gradual changes in a routine work environment and interact frequently with the supervisors and

coworkers sufficiently, with occasional interaction with the general public.

10. Through the date last insured, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R 404.1569 and 404.1569 (a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 20, 2012 the alleged onset date, through September 30, 2014, the date last insured.

## V. Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

*(footnote continued on next page)*

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 CFR §§404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he is unable to engage in his past relevant work. If the claimant satisfies this burden, then

––––––––––––––––––––––

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform.

(Doc. 7-2 at 26).

## VI. Standard of Review.

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla". It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The United States Court of Appeals for the Third Circuit further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if

the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence––particularly certain types of evidence (e.g., that offered by treating physicians)––or if it really constitutes not evidence but mere conclusion. *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, our Court of Appeals clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the

reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.

However, the ALJ need not undertake an exhaustive discussion of all the

evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

"There is no requirement that the ALJ discuss in her opinion every tidbit of

evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133

(3d Cir. 2004). "[W]here [a reviewing court] can determine that there is

substantial evidence supporting the Commissioner's decision, . . . the

*Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social

Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final

decision if it is supported by substantial evidence, even if the court would

have reached different factual conclusions. *Hartranft*, 181 F.3d at 360

(*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir.

1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be

conclusive . . ."). "However, even if the Secretary's factual findings are

supported by substantial evidence, [a court] may review whether the

Secretary, in making his findings, applied the correct legal standards to the

facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983)

(internal quotation omitted). Where the ALJ's decision is explained in

sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion.

### A. General Considerations

At the outset of this Court's review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, I note that the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial; rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the

Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.  *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B. Plaintiff's Allegations of Error**.

**1. Whether the ALJ erred in evaluating the weight she gave to competing medical opinions?**

The parties spar over the question whether the ALJ's evaluation of the medical evidence was consistent with approved procedures in the Third Circuit. Plaintiff argues that the appropriate level of deference was not given to the opinion of a treating physician. Defendant responds that, in an appropriate case, the ALJ may subordinate the opinion of a treating physician to that of a consulting physician (and even to that of a consulting non-examining physician as was the case here). The Court does not disagree with the Government's assertion. However, we must decide whether the ALJ properly considered the medical evidence and

comprehensively explained how she ranked the opinions of the various physicians.

Under applicable regulations of the Agency and the law of the Third Circuit Court of Appeals, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See e.g., *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. §404.1527(c)(2); and *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). This principle is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058(3d Cir. 993); see also Dorf v. Brown, 794 F.2d 896 (3d Cir. 1986). An Agency regulation addresses the weight to be given the treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of the impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2). "A cardinal principle guiding disability eligibility determinations is that the ALJ must accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 25 F.3d 310, 317 (3d Cir. 2000); see also*, Brownawell v. Commissioner of Social Security*, 554

F.3d 352, 355 (3d Cir. 2008). In choosing to reject a treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales, supra, at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

The record in this case is replete with documentation that the Plaintiff has severe impairments in the form of pre-syncope, syncope, POTS disorder or reduced orthostatic tolerance, obesity, major depression, and generalized anxiety disorder. All physicians who have examined this woman or even reviewed her records agreed with this assessment and the ALJ has acknowledged these severe impairments in her decision. (R. at 17).

The ALJ has subordinated the opinion of long time treating physician Paul R. Damske regarding Plaintiff's residual functional capacity to that of Paul Fox, the state agency physician who never saw Plaintiff but reviewed her medical records as they existed on June 11, 2014. The ALJ used Dr. Fox's RFC assessment in crafting the hypothetical question she posed to the vocational expert at Plaintiff's hearing. (R. at 76-78). Dr. Fox's RFC is more optimistic than that of Dr. Damske, who found that Plaintiff had been

functionally disabled prior to December 30, 2014 and would remain so through at least November of 2016. (R. at 781).

In an appropriate case with adequate explanation of her rationale, an ALJ may prefer the opinion of a mere reviewing physician to that of the long time treating physician. However, the Court is not sanguine that this is such a case. Dr. Fox's perspective on Plaintiff's situation is impaired to some extent due to the fact that he did not have access to the later developed medical reports from the Mayo Clinic physicians who examined Plaintiff. More significantly, the ALJ does not provide a cogent rationale for why she accepted Dr. Fox's assessment over that of Dr. Damske. The ALJ states on the one hand that she "gave great weight to all treating physicians because they are generally consistent with the overall medical evidence of record". (R. at 24). Curiously, the ALJ then notes that Dr. Damske, Plaintiff's long time treating physician, attested to the severity of Plaintiff's symptoms but gave his statement "little weight". (R. at 25). It is readily apparent that Dr. Damske may not be accorded "great weight" and "little weight" simultaneously.

The Court finds that the ALJ's rationale for rejecting Dr. Damske's assessment of Plaintiff's residual functional capacity is too cryptic and fails to provide an adequate explanation for doing so as required by Fargnoli,

supra, at 40-41. [4] The ALJ's seeming criticism that Dr. Damske "offers no specific limitations" should not have resulted in a categorical rejection of his assessment. In keeping with her duty to develop a full record as required by Dobrowolsky, supra, the ALJ could have requested that Dr. Damske prepare a medical source statement regarding Plaintiff's physical and psychological capacities. In the alternative, the ALJ should have referred Plaintiff for additional evaluation by an examining/consulting physician who had the benefit of all the relevant medical records. See 20 C.F.R. §404.1519 (a)(b)(4); see also Robaczewski v. Colvin, 2015 WL 4930115 at 9 (M.D.Pa. August 18, 2015). Also, the ALJ's observation (R. at 24) that "evidence received at the hearing level does not alter his (Dr. Fox's) findings" is a classic example of making "speculative inferences from medical reports" based on lay opinion, a practice prohibited by Morales, supra, at 317. For these reasons, Plaintiff's assignment of error on this point must be credited.

---

[4] To the extent that the ALJ's conclusion was based upon the notion that Plaintiff "took care" of her older daughters, twins, and husband during the relevant period (R. at 24), this would be a mischaracterization of Plaintiff's testimony. She testified that she did these things only incompletely and with great difficulty while requiring extensive rest periods. Her testimony is hardly consistent with the proposition that she is capable of working a sustained eight hour day. (R. at 48-54).

**2. Whether the ALJ erred by rendering a decision that is not supported by substantial evidence?**

Plaintiff's second allegation of error is that the Commissioner erred by rendering a decision that is not supported by substantial evidence. Plaintiff takes particular issue with the ALJ's failure to include mention of Plaintiff's alleged need to take a two hour break during the day and to be off task twenty percent of the time in her hypothetical question to the vocational expert. Because there is no medical opinion of record that specifically identifies such limitations, the Court will not fault the ALJ for excluding these alleged limitations from the hypothetical question to the VE. However, inasmuch as this case will be remanded for reasons discussed above, it may be that clarification of the existing medical evidence or the inclusion of additional medical opinion will ultimately require that different questions be posed to a vocational expert. For now, the content of the hypothetical questions posed in the earlier proceeding may not be viewed as categorically defective and the Plaintiff's assignment of error on this point is rejected.

**VIII.   Conclusion.**

For the reasons provided above, this case will be remanded to the Acting Commissioner for further proceedings consistent with the preceding

discussion. An Order consistent with this determination will be filed

contemporaneously.

*s/ Malachy E. Mannion*
Malachy E. Mannion
United States District Judge

Dated:  March 18, 2019.
O:\MANNION\SHARED\MEMORANDA - DJ\CIVIL MEMORANDA\2018 MEMORANDA\18-0958-01.DOCX